Your Honor, I have one preliminary question. We have two counsels that represent two separate officers and I would request that we're going to separate that time and whether we can separate that on the clock so that we don't have to come up with a separation. I'm going to take ten minutes and Mr. Lee is going to take five minutes. You got it. Judge Fernandez, Judge Rawlinson, Judge Callahan, good morning. My name is Evan Berrioth and I represent the on both sides of an officer's decision, that officer is entitled to qualified immunity. The Supreme Court has repeatedly informed this circuit that courts may only rely on General Fourth Amendment propositions in the most obvious cases. This is not an obvious case. The District Court was obligated to establish existing precedent that was sufficiently clear that put the lawfulness of Officer Schubeck's actions beyond debate. Why don't you, you're going right to the quick of what I'd like to discuss with you from the standpoint that what are the cases in terms of, I mean this is not an uncommon situation that police officers face where they get called out and there's some sort of standoff or there's someone, so in this instance there's, it's approximately a two-year-old child that's in the residence, is that correct? Eighteen month old, yes. An eighteen month old, okay. So essentially I think it would be undisputed that that's a fairly defenseless individual, the age of the child as far as that goes. What are the cases that we have that talk about the officer's right to shoot when we're talking about defense of an innocent third party that's inside in terms of, as far as when I see the undisputed, there are disputed facts here in terms of, but apparently it's undisputed that the police were called and it was in response to I believe a sister-in-law or the child's aunt that had tried to get the baby out of the residence but that Mr. Kaler would not surrender the child and she was hysterical when she called the police and there was, the police were suicidal and that the mother of the child had died a couple of weeks before. So they get out there and then what's disputed is in terms of was he using the child as a human shield or, but undisputed that the child, they were told the child was in the doorway so they couldn't make entrance in the doorway. So then apparently it's undisputed as well that at some point that the child and Mr. Kaler came out on the balcony and the child did not seem to be in distress at that particular time. There's disputed facts about a gun but I think maybe what's undisputed is he said he had a 20 gauge inside the house. The officers say they heard otherwise. It's undisputed that the word suicide by cop was said but the context is undisputed. So what's our guideline in terms of the, I'm looking at this from the standpoint of the officer took the shot not because Mr. Kaler was an imminent danger to him but because of the imminent danger to the 18 month old inside. What's our case law? Your Honor, I'm going to answer your question. Before you answer that, what was the imminent danger to the child? The imminent danger was the fact that there was an innocent defenseless child inside this apartment. There was a reasonable belief that the father was suicidal. There was a reasonable belief that the father had a loaded gun inside that apartment, a shotgun. Every time that Kaler entered that apartment, there was a reasonable belief that there was an imminent harm not only to the child but to officers. The problem I have with that scenario is that at the time the shot was fired, the, at the time the shot was fired, Mr. Kaler was outside. That is correct, but he was going back into the apartment at the time that he was shot. So Justice Callahan, getting back to your question, there's one thing I want to clarify with respect to the disputed facts. Officer Shubeck is not disputing plaintiff Nathaniel Kaler's facts. The district court was required to construe those facts in his favor as is this court. The dispute is how those facts were assessed and those facts needed to be seen in Officer Shubeck's position. And when we take those facts and the totality of the circumstances, it was reasonable for Officer Shubeck to take the action that he did. Now with respect to the case law, I think Justice Rawlinson got right to it. It's a question of whether it was imminent harm. And there was a reasonable belief based on the totality of the circumstances, based on the facts known to Officer Shubeck, that there was an imminent harm to the child when Mr. Kaler was going back into that apartment. Well, what's the claim? Because he had done what to the child in the past? Well, in the past we know, using Officer Shubeck's perspective, he had represented a disregard for the child's safety. Now, there's a question of... How had he done that? I thought what he said was, the child's going back and forth to the door, don't kick the door in because if you hurt my child, you're in big trouble. So it was a question of, what is the great danger to the child that he's causing? Taking Officer Shubeck's perspective, what Officer Shubeck was, he received information from Officer Miller. The information that he received was that Mr. Kaler had placed the child in front of the door. And he reasonably believed that he had placed the child there so that officers couldn't come in. Now, the district court has acknowledged that at a minimum, Mr. Kaler represented a disregard for his child's safety. So there was certainly an issue of whether there was potential harm. Now, there's not only the direct threat to the child, but there was the threat to the child that was presented by the circumstances of this confrontation, the escalation of this event by Mr. Kaler. The entire time this was taking place, that child was in harm's way because officers did not know, one, whether Mr. Kaler was going to harm his child, or number two, whether Mr. Kaler was going to engage in a confrontation, a firefight with officers that could also potentially harm that child. But the officers knew that the child was not in distress. Your Honor, this is a 18-month-old child. I would not expect an 18-month-old child to understand anything that was going on during that confrontation. But even an 18-month-old child can evince distress by crying. You know, there are a number of ways that that can be evinced. And the officers did say that the child was playing with a screwdriver, did not appear to be in any type of distress or fear. Well, the child was playing with an electric screwdriver, so if anything, it just further demonstrates that there's a disregard for this child's safety. Well, that may be negligence on the part of the father to allow him to do that, but harm from the father did not appear to be imminent, at least in the view of the officers at that time. And this goes back to the fact that when we're dealing with this question of imminent, it's when the child was inside that apartment. They had no ability to see what was going on with that child. They had no ability to properly assess whether Kaler was going to harm that child. That child, for example, couldn't tell the officers, hey, my dad's grabbing a gun, he's going to hurt me. My dad's choking me. How long had the officers been trying to get the child out before the shot was taken? Roughly 20 to 25 minutes, Your Honor. And weren't they waiting on a SWAT team to come and extract the father? There wasn't an order from Sergeant Herjack about waiting for a SWAT team to come. That order was not heard by Officer Schubeck. A number of officers had turned down the radios because they wanted to be able to communicate with Kaler. Kaler was yelling things from inside the apartment, ranting, expressing profanity. So they wanted to make sure that they could hear everything that was going on inside the apartment because they obviously couldn't see inside that apartment. The blinds were drawn, et cetera. Your Honor, at this time, I'd like to reserve my last two minutes for rebuttal. Let me just ask you this. So prior to the shooting, Officer Schubeck told Officer Leslie, if he comes back out on the patio, I'm going to shoot him. That is correct. So at that point, what was the imminent danger? The imminent danger was him going back in. The officers were trying to protect an innocent, defenseless child. The only way that they could ensure the protection of that child was by removing Nathaniel Kaler from that apartment, from getting him outside. This wasn't a situation where officers could simply just leave. And the only way they could ensure that protection was by bringing him back out. They knew by him going back in, we have a reasonable belief that there was a loaded shotgun inside that apartment. Kaler made threats of violence towards officers. Who said the shotgun was loaded? We have four separate officers who heard what they believed to be the sound of a shotgun being racked. Thereafter, Officer Kaler informed them that he had a 20-gauge shotgun inside that apartment. There's an old effing 20-gauge in there. Yes. An old effing 20-gauge can most certainly shoot just as well as a new 20-gauge. It is still a violent weapon. It is still a threat. Well, I'd like to ask a few more questions since we're here. And then if, with permission, I know I'm going into a rebuttal, but perhaps the presiding judge will give you a little that at the time about when you can take, you know, how long you have to wait before you can take a shot. There is no clearly established case law that specifically states how long you have to wait before taking a shot. It's a specific context of each individual case. And we have to look at the reasonableness of the officer's actions in that case. Well, if the case, if cases involve an officer shooting someone that, that they feel imminent danger from that individual, are those cases, you know, how do we, do those cases clearly establish what an officer can do when there's an innocent third party that they're protecting? Potentially, if the facts of those cases are fairly analogous with the facts of this case, that's our primary issue here is the court relied on these general Fourth Amendment propositions and then essentially piggybacked these other Ninth Circuit cases that have no factual relevance to this case. Well, the cases don't have to be identical in order to establish clearly, establish law. That is correct. They don't need to be identical, but they need to be specific enough to establish the contours of the right and put every reasonable officer on notice that the lawfulness of his actions are clearly beyond debate. And that's the issue here is that not every other reasonable officer would have believed that Officer Schubeck's actions were unlawful under the circumstances of this case viewed from his perspective. It doesn't have to be every reasonable officer. It's a reasonable officer. Correct. So as long as one other reasonable officer, yes, Your Honor. I don't know about that. I mean, it's the objective standard is what we get at. We don't say that if there's one officer who would agree, then the shooting is justified. That's not the standard. Correct. But for example, even if a officer would disagree, as the Supreme Court has informed us in Malley v. Briggs, even where two reasonable officers differ on opinion, generally qualified immunity in those circumstances is appropriate. I think my time is up, Your Honors. Thank you. So, so let me ask you this. So if the other officer on the scene was shocked that there was a shot, would that indicate that the shooting was unreasonable? No. And to put that in, again, that goes back to the fact that Officer Leslie did not make the same decisions as Officer Schubeck does not make Officer Schubeck's actions unreasonable. In this situation, we, we were weighing the balance of what Mr. Kaler was going to do and what he wasn't going to do. And what the case law says is officers are not required to err on the side of caution because they are in fear of being sued in the future. Just because Officer Schubeck made the decision to shoot, now as I, as I mentioned, as I'll, as I'll mention, the information known to Officer Schubeck was the same as what was known to Officer Leslie, but received under very different circumstances. Officer Leslie received all of his information 20 minutes after the scene had started via hearsay. Officer Schubeck was present on the scene that entire time. He heard the actual sound of a gun being fired. He heard that confrontation with Kaler out on the patio that Officer Leslie didn't. But it all goes back to, again, what the Supreme Court said in Malley v. Briggs. Two reasonable officers can be reasonable and have very differing opinions, and that officer is entitled to qualifying immunity. All right. Thank you. Well, what if, I have one more question. I'm sorry. So, Schubeck and Leslie aren't in the same position, but in terms of if, if Schubeck's wrong, if Leslie's don't miss, does that bring Leslie in? Your Honor, I think that question is better suited for Mr. Jackson as he is counsel for Officer Leslie. But no, no, no, it doesn't. But, I mean, does it necessarily follow under the law? Does it necessarily follow if, I mean, is it conceivable that Schubeck could be held in and Leslie's out under, or, or does it, it seems like that there's some, that you're saying they have to be viewed at some point. There's a line of cases that says that officers have a duty to stop something that goes wrong. Is there any case out there, to your knowledge, that would say that before something happens, I mean, Officer Leslie says, don't miss. Does that necessarily pull Officer Leslie into Officer Schubeck's wake? Well, first we'd have to determine that what Officer Schubeck did was wrong. And as long as what he did was lawful, Well, but if he's wrong, but let's say if he's wrong, does it, is there a separate analysis that goes with Leslie? I mean, you said they're from a very different perspective. I mean, does, does one follow the other or? Yes, I believe there is a separate analysis. And I'll be honest, Your Honor, I'm not prepared to address that analysis. I think that's better suited for Mr. Jackson. Thank you, counsel. Thank you, Your Honor. We'll give you a minute or two for rebuttal. This is an important case. Good morning. Good morning. I'm Greg Jackson and I represent Officer Leslie. And based on the court's questions, Officer Leslie is in a different position and the court was required to give him a different analysis, and the court clearly did not. The court was supposed to evaluate the facts in the light most favorable to the plaintiff, but the court was also supposed to review the facts as they were presented to Officer Leslie at the time he was confronted with the situation. So what facts in your view varied in the consideration of qualified immunity for Officer Leslie? It is clear that Officer Leslie did not arrive at the scene until 20 minutes after the event occurred. It's also clear that Officer Leslie only had one interaction with Mr. Kaler, not two or three as Officer Schubeck did. It is also clear that from the point where Officer Leslie first heard Mr. Kaler and then first spoke to Officer Schubeck, it was one minute. And so all of the facts that Officer Leslie was supposed to consider and factor in that were considered by the district court and took the district court months, he had one minute to make this analysis. Well, what facts were known to Officer Schubeck that were not known to Officer Leslie? Well what Officer Leslie knew when he arrived was what he, the information he received from speaking to Ms. Stillabower, the child's aunt, also from what he briefly heard from Officer Miller. And then when he arrived on this, at the landing, which is the critical point, Officer Schubeck was speaking to Mr. Kaler. So my question was, what facts were known to Officer Schubeck that were not known to Officer Leslie? The district court made the finding that they knew the same information. Okay, so what's clearly erroneous about that finding? Because the question isn't whether the two officers knew the same information. The question is whether Officer Leslie knew the information that Officer Schubeck possessed. That's the same thing. If the district court made the finding that the two officers had the same information, how does that differ from possessing the same facts? Because Officer Leslie did not know what additional facts Officer Schubeck had. I'm asking you, what were those additional facts? From the record, what were the additional facts that Officer Schubeck had that Officer Leslie did not have, from the record? From the record as determined by the district court, the information that they knew was the same. So that's what we are left with, unless you can convince us that that finding by the district court was clearly erroneous. What I'm trying to tell you is that the finding by the district court is irrelevant, because it didn't go far enough. The question is, what facts did Officer Leslie know? And Officer Leslie believed that Officer Schubeck had additional facts that justified his decision to shoot. Well, I have a question then, I guess, in terms of when there seems to be an indication that police officers have a duty to stop something if they see that it's wrong. Like say, if you see someone that's getting beat up, that you should do something about it. Officer Leslie is not his supervisor, correct? Correct. So he didn't order him to take the shot, but we do know that there's the words, don't miss, a minute before the shot's taken. What case law would Officer Leslie have out there to tell him that when he said, don't miss, that that would be aiding and abetting something that was about to happen? What is the case law out there? I don't think there is any clearly established law that would indicate to Officer Leslie that when he said to Officer Schubeck, if you are going to shoot, don't miss. I don't think there is any case law out there. What's the import of that, don't miss? What's a fair inference from that? I think the cases require the court to make no inferences from it at all, since the analysis under the Fourth Amendment and whether there's a constitutional violation is not the words, but the actions. So you're saying the words that are spoken by the officers have no relevance in the Fourth Amendment analysis? What I'm saying is that the cases indicate that a constitutional violation is determined by the actions of the officer and not their intent. Well, no, that's right. But I'm asking you, is it your position that the words have absolutely no relevance in terms of assessing whether or not there's excessive force? Is that your position? My position is that the words have absolutely no relevance in an assessment of whether qualified immunity should apply. It certainly may be relevant as to whether or not the ultimate claim is sufficient or not. But for purposes of qualified immunity, I think the cases are clear that those words  Well, in terms of determining the facts. So we first have to determine the facts before there's a determination whether or not there's qualified immunity. So in terms of determining the facts, the words don't matter? I think for purposes of qualified immunity for Officer Leslie, I am asking you to assume that he said don't miss. All right. But you're saying that's not clearly established that he can't say don't miss and that makes him an aider and a better? It is clearly established that those words do not make him an aider or a better. The question again is What if he had said put a bullet in his head? Would that change the analysis? That change the analysis at all? I don't think it would. For the same reason that if he said don't shoot and Officer Schubeck did shoot, I don't think that would change the appellant's argument in this case. They'd still say that the force was unlawful. But the point for qualified... There would be a different argument regarding Officer Leslie at that point. If Officer Leslie made an effort to stop the shooting, there would be a different argument. Wouldn't you agree? There may be a different argument, but it wouldn't have been a different argument by the appellant. The question here is with the information that Officer Leslie knew at the time, i.e. that Officer Schubeck had been at the scene for longer, and that Officer Schubeck said, one, if he comes back outside, and if he's without the child, and if he tries to go back in, I'm going to take a shot. If armed with that information, Officer Leslie clearly testifies that he did not believe that he, Officer Leslie, had enough information to take the shot, but he was going to defer to Officer Schubeck because Officer Schubeck, according to Officer Leslie, he believed had superior information. And so the question for the court at this point is whether the belief of Officer Leslie that Officer Schubeck had superior information is unreasonable under the circumstances. And there isn't a series of cases. There weren't any cited by the district court. I thought you said the subjective intent is irrelevant, so why would his belief about what was appropriate matter if it doesn't matter in the appellant's view? In the plaintiff's view, why does it matter in the qualified immunity arena? The first was the subjective belief. The second, which is the question I'm posing, is whether any reasonable officer in Officer Leslie's shoes, armed with the information that he had, would he know that his actions were unreasonable in deferring to the officer. Well, you said, you talked about his belief, and his belief is irrelevant according to your initial argument. I will strike that and repeat it this way. The question is whether any officer could objectively believe that in deferring to Officer Schubeck because Officer Schubeck had been at the scene longer than he was and had superior information about his assessment of whether deadly force was used, whether Officer Leslie's deferral under those circumstances was reasonable. And what I'm stating to you is that there is no case, not Kuhn, not Kraminski, not Gates, there isn't a circuit case or any case from any jurisdiction that says at the point where Officer Schubeck, that that was a violation of clearly established law. All right, thank you, counsel. Thank you. We'll hear from opposing counsel. Thank you, Your Honor. Good morning. My name is Tim Ford. I represent Nathaniel Kaler and his son, Wyatt. We are also the moving party on a motion to dismiss this appeal that has been deferred to this panel and I believe is before the court. On the basis that there are material issues of fact that remain to be resolved? That's correct, Your Honor, and I think you heard that from this argument. You heard an argument that Mr. Kaler had threatened people and the district court said he did not. He threatened, he'd only said he would fight the police if they came through his door. He said that there was a loaded firearm, there was no evidence of that. He said that they brought up a firearm, but he only brought up a firearm when the officer said, do you have a firearm? And he said, yes, I have an old 20-gauge shotgun inside. So he truthfully answered the officer's question. He didn't threaten a firearm. All these innuendos that they're bringing up are the disputed facts. The district court said that they had no access. Well, but it would be undisputed that there's a firearm in the house. That's correct. Because I'm giving, we're going with it. We're not giving the officers all, the others, but it's undisputed that there's a firearm in the house. It's undisputed that he, as the owner of that home. And it's undisputed that there's an 18-month-old child in the residence. That's correct. 20-month-old, actually. But yes. 20 months, okay. And it's undisputed that they've asked to turn the child over, but he hasn't turned the child over in that period of time. Actually, that's not, there's no such evidence. And one of the things you talk about is here, they talk about defying officer's orders. He never defied an officer's orders. And that's one of the things that doesn't come out here. Remember, the only order he was given was to come out. And after they decided that they were going to kill him, if he came out and went back in, they asked him to come out, and he did. And then they never told him not to go back in. They never told him to freeze. They never warned him that if he did, if he just walked back into his house to get his high chair where he was eating breakfast, that he would be killed. Now, the very fact that there are two officers here, I think, and two lawyers here representing these officers who have very different stories, I think is the reason why this case is clearly factual. Remember, Officer Leslie, from his point of view, he said, I'm not prepared to shoot. He said he was surprised and didn't even think that Officer Schubeck could be serious when he said he was going to shoot. So then, if that's it, but how do you hold Officer Leslie in here for saying, don't miss? Because he said, don't miss. And what's your best case that talks about that in terms of a, he's not a supervisor, so he's not ordering the shot. Nothing's happened at that point. So we're talking about stopping an action that hasn't occurred. Well, we're talking about not just... Because they're going to take a shot, that other officers that are not a supervisor or something like that, and there's a minute that goes by. What's the best case that clearly said, you have to immediately engage them and stop that right there? I don't know about immediately, he had a minute to ask him, what's your basis, and that's what our experts... Remember, we have three expert witnesses, two of whom testify almost exclusively for defendants, experienced police officers. One of them was involved in Glenn versus Washington County, which this court held, even his position was to probe police. And they had that time to talk about it, and our experts say they're supposed to say, well, what's your basis for that? Why do you think that's justified? That's in the case on that is Robbins versus Meacham, where it's an officer standing right next to him, not encouraging, just being there when he takes the shot is enough. I'm curious, what is the clearly established law for us to look at on when you can take a shot, when there's an eight, 20-month-old child inside, there's mention of a gun, there's mention of suicide, and there's the word suicide by cop? What case law do we look at here? I don't find the case law exactly. It's not whether... It's clear to me that Mr. Kaler wasn't pointing a gun at the officer at the time, all right? So... So the cases where when an officer's shooting a person, that he feels imminent danger from that person. This is a third person. Remember, he never says imminent danger. The Seattle policy doesn't say imminent danger. They don't say those words. They say things like that he was not... He had shown disregard for his child, that he was a good candidate for a murder-suicide. Nothing says imminent danger. They never said it. He never threatened anyone. The only reason that there was... We all read the paper where people... You read these stories where people won't come out in a standoff, and then they shoot themselves and their three children, or whatever. What is the case law that I look at here that tells officers what to do when you can take a shot? Harris... The Harris case from this court says that a man who is armed, who has killed a police officer the night before, and there are children in his house, and he is fleeing into the house, that's not enough grounds to shoot him. Right there. That's what they said. And remember, Schubeck just doesn't say, oh, I was afraid for the child. He said, well, I thought he was going to shoot the child, or maybe me. It was possible that he could do these things. Well, there's always possible. But there's clear case law that when you're encouraging someone to do something that you yourself believe is unconstitutional. Remember, he doesn't believe it's a justified shot, and he says, don't miss. And counsel just conceded to Judge Rawlinson's question that don't miss is the equivalent of put a bullet in his head, or a reasonable jury could certainly interpret it that way, and Schubeck is going to interpret it that way, because if Schubeck goes to trial by himself, he's going to argue that Leslie told him it was okay, and therefore it must have been okay. Well, let me ask you this. The Supreme Court recently heard a case in the city and county of San Francisco v. Sheehan. Do you think that case has any relevance to this case? I'm sorry. I don't know that case, Your Honor. Well, it has to do with what officers have to take into consideration when dealing with someone that's got some sort of mental illness, or, you know, I mean, technically it could apply to suicide or people that are not enjoying good mental health, if that is different. Well, I don't know about that, but we do have a unique set of facts. Remember, Officer Schubeck was not there as a sniper. He was not there. He was not even assigned to draw his gun. All right. So you're not, you don't know whether that case has anything to do with it? I don't know that case, but I know that in this case, the sergeant said, back off, leave him alone, and wait for the people to come in to take care of this problem, and Schubeck did not, and he says, oh, I never heard that, but the other, Officer Miller says he was screaming back and forth at Mr. Kaler, and remember what Mr. Kaler was arguing about? The only, if you read their testimony, the officer's testimony, when Mr. Kaler came out obeying their order to come out into a death trap, his protests were, his profanity was, why are you drawing your guns? Why do you have your guns drawn? What are you doing with your guns drawn? I have a two-year-old child here, and that is grounds to execute him. Do you need clearly established law? Well, Harris gives you much more than that. Harris gives you a murderer with a rifle, and a decision just as this one, and at least a warning. He was never warned, and Schubeck has never given a reason. Lastly, he says, I don't know why he wasn't warned. Why wasn't he said, freeze, don't move, don't go back inside. Never said those things. They just shot him through the head. Now, there is help versus, I mean, this court has said repeatedly, in the last couple of published decisions, which we cited in our response to their motion for additional time yesterday, that these cases are fact-specific, and therefore, summary judgment is rarely granted. But this is a case where- Do you find the right, the constitutional right, the same with regard to Schubeck and Leslie, or is it a different constitutional right? No, it's the same constitutional right, because according to Schubeck- So Schubeck's in, Leslie has to be in? You don't look at them separately? No, you look at them separately, but Schubeck brings Leslie in. Schubeck says, and Mr. Jackson just said to you, what Officer Leslie said is, oh, if you take the shot, don't miss. That's not, that's what Officer Leslie says. That's not what Schubeck says. Schubeck says, he said, don't miss. And I think any reasonable juror could conclude, just as Officer Schubeck will testify, that that was an encouragement to take this shot, even though Leslie knew that there wasn't grounds in his own mind to do it. So in his own mind, he knows the shot's uncovered. Now, on the cases that say they have to stop something, do we have any cases regarding stopping something future, or are all the cases, I'm not saying you can't make an inference from that, but are all the cases that are pulling in someone, has something already happened? I'm trying to, I think that they have started, and I guess the question is, when is it happening? When an officer says, I'm going to kill him, and after he comes back out, and comes back in, and calls him back out, has that started? I don't know. But I think in all the cases, of course, the violation that is an issue is the violation that occurs after the failure to intervene, or after the encouragement, because otherwise there wouldn't be any causal relationship. So I think all the cases involve a constitutional violation occurring after, the question of how much something had proceeded, I don't think that the cases go on. But again, this is not a situation where Officer Leslie said, whatever, or even just failed to say, do what the experts say, which is what another officer was supposed to do, which is to say, what's your basis for that? Help the other officer think. Think through what the situation is, and if he really has grounds. That's what the experts say. He didn't do that, but he also affirmatively encouraged, according to Shubeck, now whether the jury's going to believe Shubeck on this, I don't know. But I can't say that Shubeck's statement, that Leslie encouraged him, even though he was surprised, and shocked, and didn't think there were grounds to shoot, is untrue. Because the jury could credit that, and Officer Shubeck, I guarantee you, will make a very big point of that at trial, and the jury needs to sort that out. Now, this is a common situation, and it is one where usually there are actually threats. Usually there has been some kind of actual domestic violence. Usually there has been an actual threat or display of a weapon, and officers are still able to get out of this. This whole question, and if you look at Lieutenant Black's declaration about this question of murder-suicide, this is a problem sometimes of officers who lack this kind of training, and the knowledge of what a reasonable officer should do. They believe things from television. But in fact, we asked every single officer, and we asked the chief of police, has there ever been a case in the city of Seattle where during a standoff like this, someone killed a family member? None. They never knew of one. Shubeck had this idea that this, and when we asked Shubeck, what was his basis for believing that this was a danger, and this was a risk, and this could happen? He said, well, I remember sometime in my training there was a mention of murder-suicide, but I can't remember anything more about it. And then he came up with a situation where an NFL player had been killed by his girlfriend. It didn't even involve a police standoff. So part of this was an officer acting unreasonably on information that is not accurate, and that no reasonable police officer would believe was justification for killing someone. And remember, this was a deliberate, premeditated, that's the district court's word, decision to kill Mr. Kaler if he did something that's completely innocent, which is walk in his house and never telling him that that would be the consequence. And I think that that's far beyond the pale of any of the cases that this court has held. At least there's a jury question, and we believe that there shouldn't even be a jury question. This was a clear constitutional violation by Shubeck, and the only factual question is whether Leslie encouraged it or not. Unless the court has other questions, I think I've covered everything I intended to. All right, thank you, counsel. Thank you, Your Honor. Thank you. We'll give two minutes for rebuttal. Thank you, Your Honors. There's something that needs to be made clear here with respect to the facts. Officer Shubeck has accepted that the court must construe those facts in Plaintiff Nathaniel Kaler's favor, but what the district court did is it characterized those facts from Nathaniel Kaler's perspective or the perspective of jury, not a reasonable officer sitting in the shoes of Officer Shubeck. For example, they say that Kaler never threatened to use a weapon, but we know this is an undisputed fact that officers heard the racking of a shotgun. It is not unreasonable for officers to believe that the racking of a shotgun is a potential threat. That shows I am arming a weapon. There's a reason why in these Hollywood blockbusters, before the big fight scene, you always see the guy rack the shotgun. It shows intent. We also know that they learned that there was a shotgun inside the apartment. You put two and two together, that's reasonable. We know that there was a suicidal male. Now, this call... Why wouldn't there be a warning then, even if the officer thought there was a threat? Why wouldn't he warn Mr. Kaler, freeze, don't go back inside the house. If you go back inside the house, I'm going to have to shoot. Why wouldn't that have occurred, even if he felt threatened? Because based on the totality of the circumstances, all of the information known to Officer Shubeck, he did not believe it was feasible. He was concerned that if he gave that warning, there was a potential that Kaler, for example... Ultimately, we don't know what Kaler was going to do, but there was a potential that he could run inside, grab that gun. He had already threatened officers that he would fight them if they tried to engage him. There was that concern. The question isn't... He didn't say he would fight them if they tried to engage him. He said, if you break in the door, you might hurt my son and you'll have one angry person. That's what he said. He didn't threaten to fight them. What the district court's facts are is that he said, I will not fight you unless you enter the apartment. We have to review that from the perspective of a reasonable officer on the scene, looking at all the facts, not taking this one fact in a vacuum, but looking at all those facts together is, is it normal to tell officers you're going to fight them? When you have a suicidal male, you know that there is a gun present. Officers are trained to be able to diffuse situations, and they confront angry people all the time. That's part of the job. And so it's not unusual for an officer to confront an angry person who's threatening to fight, who's combatant. So that's not unusual. If we take that singular fact, yes. But when we look at all the facts, threats to fight, a 18-month-old innocent child inside the house, the reasonable belief that there's a loaded shotgun inside that house, and that that fight is going to be a deadly fight, whereas this individual is going to use a shotgun. And you are correct, Your Honor. Officers are trained to de-escalate these situations. That is what these officers were trying to do. They were, importantly, trying to ensure the safety of this child, ensure the safety of officers. The only way they could do that is by bringing Nathaniel Kaler outside that apartment. And it was reasonable for Officer Schubeck, based on those circumstances, to believe that providing Kaler a warning at that time could potentially make the decision worse. Again, if we look at the factors of- I have a question. Have you, are you familiar with the city and county of San Francisco versus Sheehan? I am not, Your Honor. Okay. All right, Counsel. Could you please sum up? We think we understand your position. Your Honor, there is no case law that exists that is sufficiently clear at the time of this event that established Officer Schubeck's actions were unlawful under these circumstances. The cases cited by Counsel, Harris, Kernow, George, and Glenn, do not provide that here. All right. Thank you, Counsel. Thank you, Your Honor. Thank you to both Counsel. The case just argued is submitted for decision by the Court.
judges: Fernandez, Rawlinson, Callahan